## Kelly et al. v. Marshall's Adm'r.
(Decided June 14, 1938.)

668

TYE, SILER, GILLIS & SILER and R. W. KEENON for appellants.

R. C. BROWNING and J. B. JOHNSON for appellee.

OPINION OF THE COURT BY JUDGE BAIRD—Affirming.

C. M. Kelly and James Offutt appeal from a joint and several judgment, rendered against them in the Whitley circuit court on the 2nd day of February, 1937, for $8,000 in damages for the negligent killing of Andrew Marshall, deceased. By their motion and grounds for a new trial they complain of fourteen alleged errors, but counsel virtually waives all, except the following: (1) The court erred in instructing the jury; (2) in admitting incompetent evidence; (3) in refusing to continue the case because of the absence of the witness, Arnold Stewart; and (4) that the verdict was against the weight of the evidence and not supported by the law.

A discussion of these alleged errors, 1, 2 and 4, requires a statement of the material parts of the evidence developed upon the trial. Appellee's cause of action is based upon the alleged general negligence of James Offutt, the agent and servant of C. M. Kelly, who was operating a taxi belonging to Kelly that caused the death of Andrew Marshal, a boy, nine years of age. Appellants, in answering denied the material allegations of the petition, and by separate paragraphs alleged: (1) That Marshall's death was caused by his contributory negligence, and (2) they further alleged that Offutt, the agent, was operating at the time of the accident the car in a prudent and careful manner, and while doing so, Andrew Marshall ran into and against the car which resulted in his death; that his death so far as appellants were concerned was unavoidable. The allegations of the answer by reply were denied. On these issues the case was tried and the proof heard by the court and jury.

On Saturday, September 12th, 1936, between nine and ten o'clock in the morning of that day, on Main

Street, between the intersection of 17th and 18th Streets of South Corbin, a portion of the city of Corbin proper, Andrew Marshall was injured and killed by being struck by a taxi owned by appellant Kelly, and operated at the time by Offutt. The evidence establishing the liability for the injury of the boy is in conflict; the exact location of the street where he was injured and the time and place when struck by the taxi; the rate of the speed of the taxi at the time it injured the boy; the question whether the boy suddenly or unexpectedly jumped into the taxi from a moving wagon in which he was at the time riding; or whether he was walking or running in the street at the time or attempting to cross the street when struck, or whether Offutt, the operator of the taxi, negligently failed to give notice of his approach in the crowded street by the horn on his taxi, as well as the rate of speed that the taxi was running, or whether the accident was in the business or residence portion of the city, or in both, are in sharp dispute. The undisputed facts are, that Andrew Marshall in company with a neighbor boy, Arthur Smith, who was about ten years of age, at some point on 16th Street before reaching the 17th Street intersection, were riding in a coal wagon together, in charge of Taulbey Stewart who was traveling north on Main Street going toward Corbin proper. In front of Lawson's store on Main Street, Smith and Marshall dismounted from the wagon and went up in front of Neal's filling station and there obtained a drink of water. Smith remained at the station, but the Marshall boy left it and traveled upon the sidewalk toward Williamsburg. The Smith boy saw him last near a telephone pole up the street near Stanley's store. There were wagons and other vehicles parked on each side of the street near Stanley's store. Smith did not see the taxi strike the boy, but saw the body of the boy after it was struck which was near to or even with the telephone pole where he had seen him last. Several witnesses were introduced by appellee who claimed to have seen the taxi strike the boy. In many respects their evidence fails to agree. Each of them stated that they saw the car when it struck Marshall; that he was in the street apparently attempting to cross it. All agree that Offutt, the driver of the taxi, did not sound his horn nor give any signal of his coming. He was running his taxi at a rate of speed ranging from 40 to 45 miles an hour, according to the testimony of several witnesses.

They also stated that the taxi skidded when it struck or was about to strike the boy, 45 feet or 15 steps; that the headlight of appellant's taxi struck the boy and was damaged and Marshall was knocked with great force by the moving car, causing his head to strike the handle of the door on the side of the car that Offutt was driving.

Alph Parker, a witness for appellee, stated that he was on the sidewalk west of the street going south about 50 or 60 feet from where the boy was struck by the taxi; that he saw the taxi coming north; that it was traveling from 40 to 45 miles an hour; that he saw the boy before he was struck; that he was 3 or 4 feet from the berm of the street near the taxi on the west side of the street going north. The boy was traveling on that side of the street. Appellants' taxi was traveling in the same direction of the boy and on the west or the wrong side of the street. There was sufficient space for the taxi to have passed the boy, had it remained on the ght side of the street; that it was approaching the boy from his rear; that the accident occurred in front of Stanley's store; that the wagon and team were on the west side going north, and as the taxi approached the wagon and team, it cut around the corner on the right hand side and struck the boy; that the headlight on the taxi first struck the boy as he was going from the taxi and knocked him back against the handle of the door of the taxi. Wes Rogers stated that he was traveling along the sidewalk within 15 or 20 steps of the boy when he was struck; that the boy was on the west side of the street going north; that the taxi was on the same side going north, which was the wrong side for it to travel; that there was nothing on the paved road to prevent the taxi from traveling upon the right side or to cause him to move over on the west or left side; that the boy was struck in the back of the head by the handle of the door; that the taxi at that time was going at a rate of speed of from 40 to 45 miles an hour; that the taxi skidded and left marks upon the street, three or four times the length of the taxi. Austin Little stated that he was in front of Neal's service station on the west side of the highway about 100 feet from the accident. He saw a wagon on the west side of the street on which two boys were riding, going south; that when the wagon got near Neal's filling station, the boys got off and went into the filling station. One of them was Arthur Smith, the other Andrew Marshall. The Smith boy got a drink

of water and remained at the station, but the Marshall boy proceeded up the sidewalk. He saw the Marshall boy out in the street about 2 feet on the west side. The taxi came along the street on the right hand side. It changed its course to the center of the street and toward the left hand side where it struck the boy; that the bumper and fender hit the boy and threw him up. He saw where the taxi had skidded; that the marks showed the skid to extend 15 steps; that the prints of the skidding were about the center of the street. The taxi was traveling, as he estimated it, about 40 miles an hour when it struck the boy. He saw the wagon in which the two boys were riding after it left the filling station and it was on the side of the street and off of the berm. Another wagon or truck was on the other side of the street at about Stanley's store. The boy was struck near Stanley's store. When struck by the taxi he was a good distance behind the wagon, but was on the side that the wagon was on at the time the taxi struck him. The right front headlight struck the boy and the last time he saw him, he was off of his feet. He thought that the front fender and headlight first struck him and then the taxi moving on, caused his head to strike the handle of the car door. The boy was 12 or 15 steps north of the wagon when he was struck. Arthur Smith who was riding in the wagon with Marshall, stated that they got off of the wagon near Stanley's store which is on the same side of the street as Neal's filling station; that he went into the station and got a drink and after that the Marshall boy went up the street; that the last time he saw him, he was at a telephone pole; that after he was struck he saw the body of the boy near the same telephone pole; his head was on the concrete and his feet off of and about the middle of the street. Herbert Shelton and Lisha Green, barbers, who were in their barber shop on Main Street, at the time of the accident, stated that they heard a loud noise, indicating the skidding of a car upon the concrete. They ran out into the street and found the taxi was about in the middle of the street on the west side of the highway going north; that the skid marks on the concrete were stepped off in their presence and amounted to 45 feet or 15 steps. There was a wagon on the other side of the street on the berm and off of the concrete; that the skid marks were straight with the street, a little near the left hand side thereof coming north; that at the time they heard the

sound of the brakes, they were singing a song; that the sound was loud enough that they heard it and at once left their shop and went out of it; that the body of the boy was lying on the left side of the street, his feet off of the concrete or near the berm of the street. The handle of the door of the taxi was glued with hair and blood. Tom Marshall, the father of the deceased, stated that the place where his son was killed, cars and wagons were parked; that it was a busy place upon the street; that each side of the street is closely built up with business houses and residences; that on Saturday large crowds visited these stores; that within this block where the accident occurred, there are seven business houses and four residences; and on the other side of the street, adjoining the block going south, there are two residences within two blocks of where this accident occurred; that he took charge of the body of his boy after he was killed; that the back of the boy's head was torn; that just below his knee on the left leg there was an injury that looked like the print of a bumper, and there were two red marks of about 2½ inches. The skin was not broken, but the side of the leg was black. G. G. O'Neil, the undertaker, who took charge of the body and prepared it for burial, stated that there were injuries in the back of the head or rather in the crown of the head in the shape of the letter "Y," and that it was about 5 inches running up and down; that he had a fractured skull and that there was a hole in his head as large as a dollar from which the brains and blood oozed from the wound. This in substance, is the testimony presented by appellee upon the trial of the action. The trial court was not in error in overruling appellants' peremptory instruction.

On the other hand, a number of witnesses who testified for appellants stated that they saw the accident. In portions of their evidence, they contradicted each other on material points. James Offutt stated that the accident occurred between 17th and 18th Streets; that he was meeting the coal wagon in charge of Taulbey Stewart, drawn, as he thought, by horses; that Stewart, the driver of the team was sitting upon a seat of the wagon, as was also his boy; that the deceased was in the rear part of the wagon and was riding in a space beyond the ingate of the wagon; that he had his back to him. He did not state whether he was standing or sitting upon

the wagon. He did state, however, that he had his back to him and he was facing the north; that is, his face was in the direction that the taxi was going; that just as he got even with the wagon, Andrew Marshall jumped into the side of the taxi; that the first thing he saw was the boy coming right at him; that he glanced at him as he came toward the door of his taxi; that he was at the time running his taxi from 18 to 20 miles an hour; that after Marshall struck the taxi, he stopped within 30 feet; that the body of the boy was 10 feet in the rear of his taxi, lying upon the street; that the space between the wagon and the parked vehicles upon the street was about 12 inches; that he threw on his brakes at once, causing his taxi to skid. Mrs. Clarence Bolten stated that she was 7 or 8 yards from the taxi, backing out from the garage where she kept her car, into the driveway at her mother's residence, at No. 1715 South Main Street, on the east side going north; that she looked back to see if the traffic on the street was in her way; that she saw the boy in the air. He seemed to make a leap from the wagon. It looked as if he jumped over the wheels of the wagon in which he was riding. She did not give any attention, she stated, to the speed of the taxi, but did state that the boy's body, when picked up in the street, was approximately two car lengths from the taxi; that when she first saw the body after it was struck, it was spinning on the pavement after the taxi had pulled on up. She did state that the taxi was on the right side of the highway going toward Corbin when it stopped. Ruth Peace O'Neil stated that she lived on 18th Street; had started down to the store in company with Mary Cox and her children; that she saw the accident; that it occurred between Triplett's and Stanley's stores; that James Offutt passed her and Mary Cox and as he did so, she "Hollered hello" to him. She also saw a wagon going toward Williamsburg with a man and two boys riding in it. She saw one of the boys stand up and saw him step off of the wagon, and as he did so, he hit the handle of the taxi door; that Offutt stopped his taxi and took charge of the boy and went away; that his taxi was running from 20 to 25 miles an hour. Mary Cox in substance, stated about the same as Ruth Peace O'Neil. The deposition of Arnold Stewart was read and the substance of his statement is, that he was riding on a wagon driven by his father on September 12, 1936, in Corbin, Kentucky; that An-

drew Marshall was on the wagon; that he got off at 17th Street, but got back on again and was riding in the back end of the wagon; that he saw the car coming, meeting the wagon; that just before the taxi reached the wagon, Marshall started to jump off and he "hollered" at him and told him to "watch out"; but he jumped off of the rear of the wagon, running into the side of the taxi as it was passing; that the front of the taxi had already passed when he got off; that he stepped against the taxi immediately after he got off of the wagon. Taulbey Stewart, the driver of this wagon, stated that he was not sitting down on a seat in the wagon but was standing on his feet, driving very cautiously on account of the busy traffic and crowded condition of the highway; that he did not see Marshall get back on his wagon after he had left it at Neal's filling station. He does not state that he heard his son speak to Marshall and tell him not to jump; that if the boy got on or off the wagon, he did not know it. He did not see the accident at all, nor did he see Marshall until after he was struck. He further stated that his son was not sitting on a seat, because there was no seat in the wagon, but at the time was sitting on a shovel on a sack of straw, "in a corner like," in the front of the wagon; that he saw the taxi as it passed him and it was on the right hand side of the street; that he heard the brakes "screaking" on a car at about the time it was at the back end of the wagon; that he stopped as soon as he could and looked back and the boy was lying in the street, and that the blood at that time was coming out of his skull and it "looked like" it had been cut. He could not state how far the body was from the taxi but did state that it was over 15 feet; that the taxi was at least 12 steps, or nearly that far, from his wagon; that when the taxi passed his wagon, there was but little space and cars were parked on either side; that the taxi did not cut over on the left side before it passed him. He could not state how fast it was going; that the body of the boy was lying near the middle of the street. Herman LaForce stated that the headlight on the taxi was damaged before the accident; that he examined it and noticed that the headlight was out and that he had ordered one for it; that he again saw it after the accident and it was like it was before. Howard Wells who was working for appellant Kelly, stated that he saw a portion of the accident; that he was standing on the

corner of 18th and Main Streets; that he saw the taxi going north, but he did not notice it, however, until he heard a noise and a "racket"; that he then looked up toward the noise and the "racket" and saw the taxi which was on the right hand side of the street going north, and he saw a wagon which was on the left hand side of the street going south. He saw a boy lying some 10 or 12 feet behind the taxi; saw Offutt pick up the boy, but did not see the taxi strike the boy at all. Morris Parker stated that he was on 17th Street; that he did not see the accident, but he heard the boy hit the taxi; that he then turned around and the boy had not stopped "kicking around"; that he saw Offutt go back and pick him up and take him away. That was in effect the substance of his testimony. It was further in evidence that Offutt had a false foot upon his right leg; that on account thereof he could not bend his foot unless he had his heel upon the floor of the car; that in order to throw on the brakes he was compelled to raise the entire leg. However, it was in proof that he had been driving a car for many years.

Appellants at the conclusion of their testimony again moved the court for a peremptory instruction which the court refused and which we think was proper. The evidence was sufficient to justify the verdict rendered. As we have often said, and many times emphasized in opinions in the past, that where the evidence is contradictory and conflicting, as in the instant case, it is the sole province and prerogative of the jury to reconcile the conflicting evidence and to seek from the evidence and circumstances reasonable to be inferred the true and proximate cause of the injury and the death of the boy, and whether it was the result of the negligence of appellant Offutt or was the result of his own contributory negligence. The jury were the judges.

As we said in Louisville & Nashville Railroad Company v. Conn, 179 Ky. 478, 200 S. W. 952, 954:

"Where the evidence is conflicting and reasonable minds might draw different conclusions therefrom, the court should submit the issues under appropriate instructions to the jury, and its finding will not be disturbed by this court, although it sitting as a jury might have reached a different conclusion. Louisville & I. Railroad Company v. Roemmele, 157 Ky. 84, 162 S. W. 547; C., N. O. &

T. P. Railroad Company v. Goode, 169 Ky. 102, 183 S. W. 264; Hostetter v. Green, 170 Ky. 119, 185 S. W. 511; First National Bank v. Stephens & Steely, 157 Ky. 663, 163 S. W. 1097; Miller's Adm'r v. Ewing, 163 Ky. 401, 174 S. W. 22; Forgy v. Rutledge, 167 Ky. 182, 180 S. W. 90; Interstate Coal Company v. Shelton, 160 Ky. 40, 169 S. W. 546.''

The verdict of the jury was not flagrantly or palpably against the weight of the evidence. Kelly v. Marcum, 272 Ky. 609, 114 S. W. (2d) 1102.

Based upon the entire evidence, the court gave the jury over the objection of appellants the instructions which they contend in part are erroneous and prejudicial to their substantial rights. Instruction No. 1 is the usual, customary and often approved instruction in cases of this character, where the facts are similar to those in the instant case, defining the duties of the operator of a taxi. Among the defined duties set out in instruction No. 1 was, that the operator of a taxi ''should sound his horn whenever necessary.'' Counsel contends that it was error to impose that duty upon the operator, unless qualified by saying that if the operator saw or by the exercise of ordinary care could have seen the Marshall boy on or near the street. He cites and relies upon the following cases: Bruce's Adm'x v. Callahan, 185 Ky. 1, 213 S. W. 557; Metts' Adm'r v. Louisville Gas & Electric Company, 222 Ky. 551, 1 S. W. (2d) 985; Trainor's Adm'r v. Keller, 257 Ky. 840, 79 S. W. (2d) 232; Best's Adm'r v. Adams, 234 Ky. 702, 28 S. W. (2d) 484; Pryor's Adm'r v. Otter, 268 Ky. 602, 105 S. W. (2d) 564 and possibly others.

On a careful analysis and examination of those citations, we find the facts dissimilar in many respects to the facts and circumstances here. We cannot reach the conclusion that the principles enunciated in either of those cases condemn or disapprove the part objected to of instruction No. 1. We have often said and still say, that it is improper under certain state of facts and circumstances to impose as one of the duties of an operator of a taxi to sound a horn or other device, warning of his approach upon a street, except when necessary. It is the sole province of a jury to pass upon and decide from the facts and circumstances developed in the evidence whether or not a signal as provided by the statute should be given. In the case of Metts' Adm'r v.

Louisville Gas & Electric Company, supra, we said (page 987):

"On the other hand it is the duty of the driver of an automobile to observe a lookout upon the street, and, if there are persons in proximity to the path of the car, unless it is evident that they are aware of its approach and out of danger, to give a warning signal, to bring his car under control, to regulate its speed, and exercise ordinary care generally so as to avoid injury to them."

Section 2739g-28, Kentucky Statutes, provides:

"Every automobile and bicycle, when in use on a public highway shall be equipped with a horn, bell or other device capable of making an abrupt sound sufficiently loud to be heard under all ordinary conditions of traffic, and every person operating an automobile or bicycle shall sound said horn or other sound device whenever necessary as a warning of the approach of such vehicle to pedestrians, or other vehicles, but shall not sound said horn or sound device unnecessarily."

In the instant case, Offutt admitted that he saw Marshall before reaching the wagon and before he jumped from the wagon; that he had at the time his back to him. It is in evidence that the streets were congested; that there was a very small space for his taxi to pass the wagon on which the boy was riding. This condition made it his duty to have his taxi under control and to sound a warning of his approach. It was in the business and residence portion of the city. A failure to sound his horn or other device, as required by the statute, was negligence. The record reveals from the testimony of several witnesses that the boy was on the left side of the street going north with his back to Offutt. Offutt stated that the boy was in a wagon either sitting or standing with his back to him. It certainly was not error to require the operator to give warning of his coming. It is possible, if not probable, and we might safely say, practically certain, had appellant Offutt given the warning by blowing his horn, the injury and death of the boy might have been avoided. The further complaint is made of another alleged error in the same instruction; that is, the use of the phrase "whenever necessary" instead of "if necessary." It will be observed that the court used in this instruction

the exact words of the statute which is "whenever necessary." The word "whenever" is a synonym of the word "if." The use of either of those words conveys practically the same thought. A substitution of "if" for "whenever" would neither add to nor subtract from the meaning of the phrase. This contention is obviously without merit. Counsel contends that instruction No. 2 was erroneous, where it provided that if Offutt was operating his taxi at a greater speed than 15 or 20 miles an hour, at the time and place, that would be negligence. This instruction on the question of speed follows the provision of Section 2739g-51 of the statute, which, where applicable in the instant case, provides:

"* * * Where a highway passes through a closely built up business portion of any city or town, if the rate of speed of passing automobiles thereon exceeds fifteen miles per hour it shall be prima facie evidence of unreasonable and improper driving.

"Where a highway passes through the residence portion of any city or town or around any sharp curve, or on a steep grade in or outside of such city or town, if the rate of speed of passing automobiles exceeds thereon twenty miles an hour it shall be prima facie evidence of unreasonable and improper driving. * * *".

It is shown by a preponderance of the evidence that the taxi at the time of the injury was being operated from 40 to 50 miles an hour. Offutt admits the speed to have been from 18 to 20 miles an hour. Other witnesses for appellants fixed the speed at from 20 to 25 miles an hour. When we consider that the place where the accident occurred was in the business and residence portion on that part of Main Street, between 17th and 18th Streets, in the city of Corbin, and that the streets were congested and the traffic great, this instruction was fully authorized. It is a rule of this court, based upon the statute, that operating a taxi or motor vehicle of like character in excess of 20 miles per hour in the residence portion of the city is prima facie evidence of negligence or the violation of the speed limit. Utilities Appliance Company v. Toon's Adm'r, 241 Ky. 823, 45 S. W. (2d) 478; Wight v. Rose, 209 Ky. 803, 273 S. W. 472. It is contended that the violation of the speed limit should not be considered in arriving at the cause of the injury

and death of Marshall. That conclusion the court does not accept. Under the conditions developed by the evidence, it was the duty of Offutt, as he passed along the street, as described, to anticipate pedestrians crossing or attempting to cross the street, and especially on Saturday, when pedestrians, including children, may be expected to be on the streets, and, therefore, should be anticipated by an operator of a taxi. Thus, we conclude that instruction No. 2 was not error. It is further contended that instruction No. 3 defining "ordinary care" was error. Counsel admits that in the case of Pryor's Adm'r v. Otter, 268 Ky. 602, 105 S. W. (2d) 564, this instruction was in effect approved, and further concedes the rule to be that where children might reasonably be expected, an instruction similar to No. 3 would probably be proper. We cannot conceive of a stronger array of facts and circumstances, as found in the instant case, where an operator of a taxi would be more liable to expect children, as well as adult pedestrians, to be, than where this accident occurred. Instruction No. 3, defining "ordinary care," is verbatim of an instruction given and approved in Metts' Adm'r v. Louisville Gas & Electric Company, supra. We find no error in instruction No. 3. Counsel contends that No. 7, the "sudden appearance" instruction, was error; also, No. 8, the "last clear chance" instruction, should not have been given at all. It is contended that that instruction nullifies the "sudden appearance" instruction. No. 7, we think, fairly submits the defense of appellants to the jury. Appellants cannot, therefore, be heard to complain. We embody that instruction in this opinion:

> "If the jury believe from the evidence that the plaintiff's intestate went out into the street from behind a wagon or other obstruction, or jumped or stepped so close to the car that, if the car was running at a reasonable rate of speed as defined in instructions No. 1 and 2, the driver could not by the exercise of ordinary care have perceived his danger, stopped the car, changed his direction or slacked his speed, so as to avoid injury to him, the jury will find for the defendants."

Instruction No. 8, the "last clear chance" doctrine, or in modern parlance, the humanitarian doctrine, as given by the court, is as follows:

"Although the jury may believe from the evidence that the plaintiff's intestate ran into the street from behind a wagon or other obstruction so close to the car of defendant or running into the path of the defendant's car, or that he was guilty of contributory negligence as set out above, yet if you further believe from the evidence that the driver of the defendant's car saw, or by the exercise of ordinary care, could have discovered his peril in time to have avoided his injury, with the means at his command, or within his control, had his car been running at a reasonable rate of speed, you shoud find for plaintiff."

It is conceded that no statutory warning was given by appellant Offutt. At the time he was operating his taxi upon Main Street, a closely congested street, he claims that he saw the driver of the team sitting on a seat in the wagon and a boy sitting by him; that he also saw a boy in the rear of the wagon with his back to him. It is, therefore, somewhat questionable whether under the facts, as developed in the case, the "sudden appearance" doctrine applies. See the Metts Case, supra. In the case of Knapp v. Gibbs, 211 Ky. 278, 277 S. W. 259, we said (page 260):

"A person may not violate the laws of the road and operate a car at such excessive speed as to prevent reasonable control in an emergency, and then be permitted to say that after the emergency arose he did all he reasonably could with the means at his command to avoid injury."

However, if this instruction No. 7 was error, appellants received the benefit of it and of course cannot complain. The "last clear chance" instruction properly and fairly submited that issue to the jury. Appellee's evidence at least shows that the boy was in the street, plainly to be seen by appellant Offutt as he approached him in his taxi. Also, that he was operating the taxi at an unreasonable rate of speed and in a congested area; that he failed to give the statutory warning and at no time slackened the speed of the taxi. These facts tend to establish his failure to use ordinary care. The facts developed in the whole case authorized the applying of the "last clear chance" doctrine. Myers v. Cassity, 209 Ky. 315, 272 S. W. 718; West Kentucky Transportation Company et al. v. Dezern, 259 Ky. 470,

82 S. W. (2d) 486; Kinsella et al. v. Meyer's Adm'r, 267 Ky. 508, 102 S. W. (2d) 974. We think that the instructions as a whole fairly and properly submit the issues made by the pleadings and evidence to the jury. In fact, we seldom find a set of instructions in a complicated case like this which so fairly and properly submit the issues to the jury.

It is contended further that the court committed a prejudicial error by refusing to continue the case because of the absence of the witness Arnold Stewart. There is no foundation for that contention. Counsel for appellee contends that there is nothing in the record to show that the boy was ever summoned to appear as a witness. Waiving that, it appears from the record that the affidavit of the boy was read to the jury as his deposition, as provided by Section 315, Civil Code of Practice. Considering the youth of the boy which the evidence shows to be eight years of age, it is doubtful that his presence and testimony when the privilege of cross-examination was exercised would have been as strong and as forceful as the ex parte affidavit that the court permitted to be used as his deposition, and which was read to the jury. The granting of a continuance for that ground was in the sound discretion of the court. That discretion was not abused. Louisville Railroad Company v. Vessels' Adm'x, 159 Ky. 664, 167 S. W. 924; Bon Jellico Coal Company v. Murphy, 161 Ky. 450, 171 S. W. 160.

We find no prejudicial error in the proceeding authorizing a reversal of the case.

Wherefore, the judgment is affirmed.